# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

FARMERS INSURANCE EXCHANGE,
     Plaintiff/Counterdefendant,

vs.                                                                Civ. No.          10-611 JP/GBW

FEDERAL INSURANCE COMPANY,
     Defendant/Counterclaimant.


## MEMORANDUM OPINION AND ORDER

In this declaratory judgment action,[1] Federal Insurance Company (Federal) moves the

Court for partial summary judgment to establish the priority of insurance coverage between a

policy issued by Federal and a policy issued by Farmers Insurance Exchange (Farmers).[2]

Federal, which paid $3.75 million to settle an underlying wrongful death case, now seeks

---

[1]Farmers' AMENDED COMPLAINT BY INSURER FOR DECLARATION OF
RIGHTS UNDER INSURANCE POLICY AND FOR EQUITABLE CONTRIBUTION (Doc.
No. 1) (Complaint) was removed to federal court on June 24, 2010. Federal filed DEFENDANT
FEDERAL INSURANCE COMPANY'S ANSWER TO PLAINTIFF'S AMENDED
COMPLAINT FOR DECLARATION OF RIGHTS UNDER INSURANCE POLICY AND FOR
EQUITABLE CONTRIBUTION, AND COUNTERCLAIM (Doc. No. 4) (Counterclaim) on
June 25, 2010. Farmers filed ANSWER OF COUNTER-DEFENDANT, FARMERS
INSURANCE EXCHANGE, TO DEFENDANT FEDERAL INSURANCE COMPANY'S
COUNTERCLAIM (Doc. No. 6) (Answer to Counterclaim) on July 13, 2010.

[2]Federal filed FEDERAL INSURANCE COMPANY'S MOTION FOR PARTIAL
SUMMARY JUDGMENT TO ESTABLISH PRIORITY OF INSURANCE COVERAGE (Doc.
No. 46) (Motion) (Doc. No. 46) on July 6, 2011. Farmers filed FARMERS INSURANCE
EXCHANGE'S RESPONSE IN OPPOSITION TO MOTION FOR PARTIAL SUMMARY
JUDGMENT TO ESTABLISH PRIORITY OF INSURANCE COVERAGE AND
COUNTERMOTION TO DEFER RULING UNTIL DISCOVERY IS COMPLETE (Doc. No.
49) (Response) on August 19, 2011. Federal filed FEDERAL INSURANCE COMPANY'S
REPLY IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT TO
ESTABLISH PRIORITY OF INSURANCE COVERAGE (Doc. No. 53) (Reply) on September
16, 2011.

contribution toward that settlement from Farmers. A total of three insurance policies are at issue: (1) a $1 million primary policy issued by Federal (Federal Primary policy), (2) a $10 million excess policy issued by Federal (Federal Excess policy), and (3) a $1 million policy issued by Farmers (Farmers Policy). Federal argues that the Federal Primary policy and the Farmers Policy must both be exhausted before the Federal Excess policy is reached.

In its Response, Farmers asks the Court to defer ruling on Federal's motion under Fed. R. Civ. P. 56(d) until discovery is complete. In the alternative, Farmers argues that Federal's Motion should be denied because (1) the Court has yet to determine whether the Farmers Policy provided insurance coverage for the underlying claim, and (2) even if the Farmers Policy does cover the claim, the Farmers Policy is excess to both the Federal Primary policy and the Federal Excess policy. The Court has considered the parties' briefing and the relevant law, and the Court concludes that Federal's Motion should be granted.

## BACKGROUND[3]

On July 9, 2008, Qui Seng Chen, a 26-year old employee of the Golden Star Restaurant (Golden Star) in Albuquerque, New Mexico, was shot and killed by an individual named Donte Powers during an armed robbery at Golden Star. Chen's estate subsequently filed suit for wrongful death and intentional infliction of emotional distress against WPI Menaul, LLC, (WPI Menaul) which operated and managed the shopping center in which Golden Star was a tenant, as well as WPI Menaul's members, John Young and Andrew Sun. Neither Yan You, the owner of the Golden Star, nor the shooter, Donte Powers, was a defendant to the wrongful death suit. Donte Powers was convicted of and sentenced for first-degree murder on July 9, 2008.

---

[3]The following facts are undisputed.

At the time of the shooting, Federal insured WPI Menaul under a comprehensive insurance package issued to World Premier Investments, Inc. (WPI), which covered a total of 119 locations in multiple states, including the WPI Menaul location. *See* Complaint at 5; Motion, Exhibit B, at 1-2 (affidavit of Angela Hulten, underwriter for Federal). The insurance package included the Federal Primary policy, a general liability primary policy with limits of $1 million per occurrence, which provides that Federal will "pay damages if the insured becomes legally obligated to pay by reason of liability . . .  for bodily injury . . . to which this coverage applies." Motion at 4. Federal also issued excess and umbrella coverage as part of its package, titled "Chubb Commercial Excess and Umbrella Insurance," with limits of $10 million per occurrence. *Id*. The Federal Excess policy is labeled "Coverage A," and the umbrella coverage is labeled "Coverage B." Motion, Exhibit D, at 3. The Federal Excess policy contains a "Schedule of Underlying Insurance," which lists the Federal Primary policy. *Id.* The Federal Excess policy states, "we will pay . . . that part of the loss . . . which exceeds the underlying limits," and "this coverage does not apply to any part of loss within underlying limits, or any related costs or expenses." *Id.* According to Angela Hulten, an underwriter from Federal, the portion of the total WPI package premium attributable to the WPI Menaul location is $356 for the Federal Primary policy and $132 for the Federal Excess policy. Motion, Exhibit B, at 2.

Additionally, at the time of the shooting, Yan You, the owner of Golden Star, was insured under the Farmers Policy, which is titled "RESTAURANTS-PRIMARY." Motion at 3. The Farmers Policy includes an endorsement adding "WPI-Menaul LLC" as an additional insured. Complaint at 2; Counterclaim at 2. The additional insured endorsement in the Farmers Policy states, "The person or organization shown in the schedule is also an insured, but only with respect to liability as co-owner of the premises shown in the schedule." Complaint at 2-3;

3

Counterclaim at 2. The location of premises shown on the schedule is "2626 SAN PEDRO DR NE STE A ALBUQUERQUE NM 871103351." Response, Exhibit C, at 2. The Farmers Policy provides policy limits of $1 million per occurrence for a premium of $1,128. Motion at 3. The Farmers Policy states, "We will pay those sums that the insured becomes legally obligated to pay as damages because of bodily injury . . .  to which this insurance applies." *Id.*

In the wrongful death suit brought by Chen's estate, both Farmers and Federal participated in the defense of WPI Menaul, through two separate defense attorneys. Farmers provided its defense under a full reservation of its rights, as set forth in a letter issued August 19, 2009. Complaint at 9; Counterclaim at 6. At a mediation on May 3, 2010, Federal agreed to settle the case on behalf of all defendants for $3.75 million in exchange for a full release and an order of dismissal with prejudice. *See* Response, Exhibit A, at 3-4 (affidavit of Steve Coons, adjuster for Farmers). The settlement was paid entirely by Federal. *Id.* During the mediation, but before the settlement was finalized, Farmers offered to contribute $200,000 towards a settlement. *Id.* Federal rejected Farmers' offer and unilaterally settled the case with Chen's estate. *Id.*

Following Federal's settlement of the wrongful death suit, Farmers filed its Complaint for declaratory judgment, asking the Court to rule that (1) the death of Ms. Chen was not covered by the Farmers Policy, (2) Farmers had no duty to defend WPI Menaul, (3) Farmers is entitled to equitable contribution from Federal to recover the defense costs and fees Farmers spent defending WPI Menaul, and (4) Farmers is entitled to the costs and fees incurred in litigating this declaratory judgment action. Farmers also argues that it should not be required to contribute to the settlement because (1) $3.75 was an unreasonable settlement amount, and (2) the Farmers Policy was excess insurance above both Federal policies and cannot be reached because both Federal policies have not been exhausted. In the alternative, Farmers argues that if Farmers must

4

contribute to the $3.75 million settlement, its contribution should be limited to (1) equitable contribution toward the percentage of fault for Ms. Chen's death that can be attributed to WPI Menaul, or (2) Farmer's pro rata share of the total cost of the defense and settlement, based on the total insurance available under all three policies.

In its Counterclaim and Answer, Federal argues that (1) Farmers must contribute the Farmers Policy limits of $1 million toward the $3.75 million settlement under a theory of equitable or common law contribution; (2) Federal is entitled to equitable contribution from Farmers for the defense costs, fees, and pre-judgment interest for the defense of the WPI Menaul principals, John Young and Andrew Sun, because Farmers breached its duty to defend Young and Sun; and (3) Federal is entitled to the costs and fees incurred in litigating this declaratory judgment action as well as post-judgment interest.

In its present Motion for partial summary judgment, Federal asks the Court to establish as a matter of law the priority of insurance coverage between the Federal Excess policy and the Farmers Policy. In opposition, Farmers argues that "any determination as to the priority of coverage between the two Federal policies and the [Farmers] policy is premature until the Court determines, as a threshold matter, whether the [Farmers] policy provides any coverage, triggering a duty to defend and/or indemnify, to [WPI Menaul] in the underlying lawsuit."[4] Response at 11. Federal "assumes that the coverage question will be decided separately." Reply at 6.

_____

[4]On October 27, 2011, Farmers filed a MOTION FOR PARTIAL SUMMARY JUDGMENT OF PLAINTIFF FARMERS INSURANCE EXCHANGE (Doc. No. 59) (Coverage Motion), asking the Court to declare that the Farmers Primary policy "did not apply to provide coverage to WPI-Menaul, LLC or any other parties in the defense of and indemnity for the underlying suit." The Court will take the Coverage Motion under consideration once the parties have completed their briefing.

In this Memorandum Opinion and Order, the Court will decide the single issue presented in Federal's Motion: If the Farmers' Policy provided coverage in the underlying suit, what is the priority of insurance coverage between the Farmers Policy and the Federal Excess Policy? In deciding this narrow issue, the Court does not rule on the merits of any other issue presented in this case, such as whether the Farmers Policy provided coverage in the underlying suit or whether Farmers might have a valid affirmative defense.

## DISCUSSION

### A.      Summary Judgment Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[5] "The movant bears the initial burden" to show the absence of a genuine dispute of material fact. *Libertarian Party of N.M. v. Herrera*, 506 F.3d 1303, 1309 (10th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "If the movant meets this initial burden, the burden shifts to the nonmovant" to show the presence of a genuine dispute, *id.*, one that "can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). The nonmovant may not rest upon mere allegations and denials in the pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *See id.* at 248-49; *Ford v. Pryor*, 552 F.3d 1174, 1177-78 (10th Cir. 2008) (explaining that the nonmovant "must present more than a scintilla of evidence in

---

[5] Amendments to Fed. R. Civ. P. 56 became effective on December 1, 2010. "Subdivision (a) carries forward the summary-judgment standard expressed in former subdivision (c), changing only one word —genuine "issue" becomes genuine "dispute." Fed. R. Civ. P. 56, Advisory Committee Notes. "The standard for granting summary judgment remains unchanged." *Id.*

favor of his [or her position"]).

**B.      Farmers' Request that the Court Defer Ruling under Rule 56(d)**

Farmers asks the Court to defer ruling on Federal's Motion until after Farmers has had

the opportunity to depose the WPI Menaul principals, John Young and Andrew Sun, as well as

the insurance agents or brokers who sold the Farmers Policy, Federal Primary policy, and

Federal Excess policy.

Under Fed. R. Civ. P. 56(d),[6]

If a nonmovant shows by affidavit or declaration that, for specified reasons, it
cannot present facts essential to justify its opposition, the court may:
(1) defer considering the motion or deny it;
(2) allow time to obtain affidavits or declarations or to take discovery; or
(3) issue any other appropriate order.

The Tenth Circuit reviews a district court's decision to grant or deny a Rule 56(d) motion for

abuse of discretion. *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086,

1096 (10th Cir. 2010).

Federal argues that Farmers has not met the requirements of Rule 56(d). In the Tenth

Circuit,

a party seeking to defer a ruling on summary judgment under Rule 56[d] must
provide an affidavit [or declaration] explaining why facts precluding summary
judgment cannot be presented. This includes identifying (1) the probable facts not
available, (2) why those facts cannot be presented currently, (3) what steps have
been taken to obtain these facts, and (4) how additional time will enable the party
to obtain those facts and rebut the motion for summary judgment.

*Id.* (quotation marks, citation, and brackets omitted); *see also Price v. W. Res., Inc.*, 232 F.3d

_____

[6] This subsection of Rule 56 was renumbered from (f) to (d) as part of the amendments to
Fed. R. Civ. P. 56 that became effective on December 1, 2010. Despite this amendment, prior
Tenth Circuit caselaw interpreting Rule 56(f) remains controlling precedent because
"Subdivision (d) carries forward without substantial change the provisions of former subdivision
(f)." Fed. R. Civ. P. 56 Advisory Committee Notes.

779, 783 (10th Cir. 2000) ("Rule 56[d] does not operate automatically. Its protections . . . can be applied only if a party satisfies certain requirements.").

Because Farmers, the nonmoving party, has neither provided an affidavit supporting its Rule 56(d) request nor satisfied the requirements articulated by the Tenth Circuit, Farmers' request that the Court defer its ruling under Rule 56(d) will be denied.

## C.     Priority of Insurance

The issue before the Court is the priority of insurance under New Mexico state law between the Federal Excess policy and the Farmers Policy.

> "In cases arising under a federal court's diversity jurisdiction, the task of the federal court is not to reach its own judgment regarding the substance of the common law, but simply to ascertain and apply the state law. The federal court must defer to the most recent decisions of the state's highest court."

*Morales v. E.D. Etnyre & Co.*, 382 F. Supp. 2d 1278, 1281 (D.N.M. 2005) (quoting *Wankier v. Crown Equip. Corp.*, 353 F.3d 862, 866 (10th Cir. 2003)). In this case, no New Mexico appellate court has addressed the legal issue presented. "Where no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do." *Id.*

Federal argues that, as a matter of law based on the undisputed material facts, the Federal Excess policy should not be invoked until all primary insurance, including the Federal Primary policy and the Farmers Policy, has been exhausted because the Federal Excess policy is a "true" excess policy, as defined by its high liability limits, low premium, and schedule of underlying insurance. *See* Motion at 1, 8.

Federal explains that "true" excess policies serve different purposes and face different risks than primary policies. Motion at 2. "A primary policy provides the first layer of insurance coverage." Douglas R. Richmond, *Excess Insurance and Umbrella Coverage*, *in* 4 *New*

8

*Appleman on Insurance Law: Library Edition* § 24.02[1], at 24-11 (2011). "The primary insurer is responsible in the first instance for defending and indemnifying the insured in the event of a covered or potentially covered occurrence or claim." *Id.* at 24-11 to -12. "[P]rimary insurers bear a greater risk and charge larger premiums than do excess and umbrella carriers." *Id.* at 24-12. Unlike primary insurance, which provides base layer coverage for a loss, an "excess policy provides specific coverage above an underlying limit of primary insurance." *Id.* § 24.02[2][a], at 24-12. "Excess insurance is priced on the assumption that primary coverage exists" and "is not triggered until the underlying primary limits are exhausted by way of judgments or settlements." *Id.* at 24-12 to -13; *see CC Hous. Corp. v. Ryder Truck Rental, Inc.*, 106 N.M. 577, 579, 746 P.2d 1109, 1111 (1987) ("An excess policy limits the insurer's liability to the amount of the loss which exceeds the maximum coverage of other valid and collectible insurance."); *Archunde v. Int'l Surplus Lines Ins. Co.*, 120 N.M. 724, 725 n.1, 905 P.2d 1128, 1129 n.1 (Ct. App. 1995) ("An excess liability insurance policy is a policy designed to protect against catastrophic loss and intended to kick-in only at large dollar-amounts of liability." (quotation marks and citation omitted)). Based on the different functions served by excess and primary insurance, Federal asks the Court to conclude as a matter of New Mexico law that "when there are multiple primary policies, all applicable primary coverage must be exhausted before the excess insurer's liability arises." Motion at 6.

Farmers "concedes that, generally speaking, excess insurance provides coverage over and above most primary policies" but argues that "under the unique circumstances of this case, there are special rules which apply to determine the priority of coverage." Response at 11. The "unique circumstances" to which Farmers refers is the presence of "other insurance" clauses in the insurance policies at issue. An "other insurance" clause is a provision within an insurance

policy that is intended "to vary or limit the insurer's liability when additional insurance coverage

can be established to cover the same loss." *Appleman*, *supra*, § 22.02[1], at 22-11.

> "Other insurance" clauses take three primary forms. Pro rata clauses provide
> that multiple policies contribute to a loss on a shared basis, such as by limits of
> the respective policies or by equal shares; excess clauses render a policy excess to other
> insurance; and escape clauses render a policy inapplicable if other insurance exists.

*Id.* § 22.02[2], at 22-13.

Although courts interpret insurance policies using general rules of contract interpretation

and try to give effect to all policy provisions, *see Rummel v. Lexington Ins. Co.*,

1997-NMSC-041, ¶¶ 18-23, 123 N.M. 752, 945 P.2d 970, in certain situations, giving effect to

the "other insurance" clauses contained in two or more insurance policies would act to leave an

insured without any coverage at all. Under these circumstances, the general rule in most

jurisdictions, including New Mexico, is that the other insurance clauses are "mutually

repugnant" and cancel each other out. *See CC Hous. Corp.*, 106 N.M. at 580-81, 746 P.2d at

1112-13; *see, e.g.*, *Hennes Erecting Co. v. Nat'l Union Fire Ins. Co.*, 813 F.2d 1074, 1077 (10th

Cir. 1987) ("Kansas has followed the majority rule and determined that conflicting 'other

insurance' excess coverage provisions are mutually repugnant and are to be disregarded.").

In this case, each of the three insurance policies at issue contains an "other insurance"

clause. The Farmers Policy includes an excess "other insurance" clause, which provides in

relevant part, "If there is other insurance covering the same loss or damage, we will pay only for

the amount of covered loss or damage in excess of the amount due from that other insurance[.]"

Response, Exhibit C, at 3. The Federal policy package has two separate "other insurance"

provisions, one governing the Federal Primary policy and one governing the Federal Excess

policy. The Federal Primary policy includes a pro rata "other insurance" clause, which is not at

10

issue in this case because the parties agree that it was proper to exhaust the $1 million limits of the Federal Primary policy to cover the settlement. *See* Response, Exhibit D, at 5-6. The Federal Excess policy contains an excess "other insurance" clause that provides in relevant part, "This insurance is excess over any other insurance, whether primary, excess, contingent or on any other basis[,] . . . under which you are included as an insured." *Id.*

Because the Federal Excess policy and the Farmers Policy both contain "excess" other insurance clauses, Farmers argues that the other insurance clauses are mutually repugnant and cancel each other out. Under these circumstances, Farmers asks the Court to adopt one of three approaches: (1) Minnesota's "closest to the risk" or "total policy insuring intent" test as applied by the Minnesota Supreme Court in *Interstate Fire & Casualty Co. v. Auto-Owners Insurance Co.*, 433 N.W.2d 82 (Minn. 1988); (2) a vertical exhaustion approach, as applied by the Wisconsin Court of Appeals in *Hansen v. Degnitz*, 701 N.W.2d 77 (Wis. Ct. App. 2005); or (3) a pro rata apportionment approach as applied by the United States District Court for the District of South Carolina in *Canal Insurance Co. v. Ranger Insurance Co.*, 489 F. Supp. 492 (D.S.C. 1980) (applying Florida law).

First, Farmers argues that New Mexico applies the "closest to the risk" test or "total policy insuring intent" test, which was adopted from Minnesota law. In automobile accident cases, Minnesota courts have applied a common law "closest to the risk" test to establish the priority of coverage between two automobile insurance policies. *See, e.g.*, *Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.*, 239 N.W.2d 445, 448-49 (Minn. 1976). Under the closest to the risk test, the insurance policy that is closest to the risk provides primary coverage, as determined through the consideration of three factors:

(1) Which policy specifically described the accident-causing instrumentality?

(2) Which premium is reflective of the greater contemplated exposure?
(3) Does one policy contemplate the risk and use of the accident-causing instrumentality with greater specificity than the other policy—that is, is the coverage of the risk primary in one policy and incidental to the other?

*Hertz Corp. v. State Farm Mut. Ins. Co.*, 573 N.W.2d 686, 691 (Minn. 1998).

In non-automobile cases, Minnesota courts have resolved priority of insurance coverage disputes using a broader approach, called the "total policy insuring intent" test. *See Interstate Fire*, 433 N.W.2d at 86. Under the total policy insuring intent test, Minnesota courts allocate the "respective policy coverages in light of the total policy insuring intent, as determined by the primary risks upon which each policy's premiums were based and as determined by the primary function of each policy." *Id.* at 85 (quotation marks and citation omitted). The total policy insuring intent test is applied "only where policies contain conflicting 'other insurance' clauses," that is, under circumstances where a loss cannot be apportioned between two or more insurers "without violating the other insurance clause of at least one company." *Christensen v. Milbank Ins. Co.*, 658 N.W.2d 580, 587 (Minn. 2003).

In *Interstate Fire*, the Minnesota Supreme Court applied the "total policy insuring intent" test to determine the priority of insurance coverage between two insurance policies that covered an injury suffered by a high school student during gym class. The class was taught by a teacher and the teacher's assistant, a high school senior. *Interstate Fire*, 433 N.W.2d at 83. The insurers agreed that the school district's general liability policy from Continental Insurance Company was properly exhausted to cover the loss. *See id.* The Minnesota Supreme Court was asked to determine the priority of insurance coverage between the school district's umbrella liability policy from Interstate Fire and Casualty Company, which contained an "excess" other insurance clause, and the student assistant's father's homeowners policy from Auto-Owners Insurance

12

Company, which contained a "pro rata" other insurance clause. *See id.* at 83-85. The Minnesota Supreme Court began by explaining that most jurisdictions would reconcile the pro rata clause and the excess clause "by interpreting the policy containing the excess clause as secondary coverage." *Id.* at 85. However, the Minnesota Supreme Court did not follow this majority approach but instead allocated the "respective policy coverages in light of the total policy insuring intent." *Id.* (quotation marks and citation omitted). The Court held that the Interstate umbrella policy was primary to the homeowners policy because (1) Interstate contracted with the school district to provide coverage in excess of the underlying insurance provided by Continental, (2) in setting its premium for the umbrella policy, Interstate relied on the underlying Continental coverage but did not rely on each student having a family homeowners policy, and (3) the Interstate "umbrella policy contemplated accidents and injuries sustained on school property during school events." *Id.* at 86.

Farmers argues that New Mexico has followed Minnesota's unique approach to priority of insurance coverage disputes, beginning with the New Mexico Supreme Court's adoption of Minnesota's "closest to the risk test" in *Branchal v. Safeco Insurance Co. of America*, 106 N.M. 70, 738 P.2d 1315 (1987). *See* Response at 12. The issue in *Branchal* was "whether an insured passenger looks to uninsured motorist coverage from the insurer of the vehicle in which he was riding at the time of the injury, or to his own insurer for uninsured coverage, as the primary insurer." 106 N.M. at 70, 738 P.2d at 1315. The Court held that "the insurer of the vehicle involved in the accident owes primary coverage," and "any other available insurance becomes secondary[.]" *Id.* at 71, 738 P.2d at 1316. In so holding, the Court reasoned that the "policy covering the vehicle involved in the accident is *closer to the risk* than the policy insuring the non-owner driver or passenger." *Id.* (emphasis added) (citing *Transamerican Ins. Co. v. Austin*

13

*Farm Ctr., Inc.*, 354 N.W.2d 503 (Minn. Ct. App. 1984)).

Farmers contends that New Mexico also has adopted Minnesota's "total policy insuring intent test" to determine the priority of insurance coverage in non-automobile cases. Response at 12. For support, Farmers cites *State Farm Fire & Casualty Co. v. Farmers Alliance Mutual Insurance Co.*, 2004-NMCA-101, 136 N.M. 259, 96 P.3d 1179. In *State Farm Fire*, the New Mexico Court of Appeals resolved a priority of insurance coverage dispute between two primary carriers with mutually repugnant "other insurance" clauses. *Id.* ¶ 6. Both parties in *State Farm Fire* explicitly asked the trial court and the Court of Appeals to apply Minnesota's "closest to the risk" test as discussed in *Branchal*. *Id.* ¶ 7. The Court of Appeals explained,

> Minnesota courts have developed two different tests to use in determining which of two insurers is closest to a particular risk. One is a three-part test that is primarily applicable to automobile cases. This is the [closest to the risk] test that was applied in *Transamerican*. In cases not involving automobiles, Minnesota courts apply a broader test requiring a determination of the "total policy insuring intent" based on the primary policy risks and the primary function of each policy. This broader approach, involving a more helpful review than the "mechanical application" of the three-part test, is applied when two policies are intended to cover risks that differ in size and type.

*Id.* ¶ 8 (citations omitted). The Court of Appeals proceeded to apply the "total policy insuring intent" test. *Id.* ¶¶ 9-11.

In the alternative, if the Court does not apply Minnesota's "closest to the risk" test or "total policy insuring intent" test, Farmers asks the Court to apply what Farmers characterizes as a "vertical exhaustion" test similar to that applied by the Wisconsin Court of Appeals in *Hansen*, 701 N.W.2d 77. Response at 16. In *Hansen*, two students were injured in a school bus accident, which was covered by four insurance policies: (1) a primary Auto-Owners Insurance Company policy held by the bus company with liability limits of $1 million, (2) an umbrella Auto-Owners Insurance Company policy with limits of $2 million, (3) a Wausau policy held by the school

14

district with liability limits of $3 million, and (4) a Wausau umbrella policy held by the school

district with liability limits of $13 million. *Id.* at 79. The issue before the Wisconsin Court of

Appeals was the priority of insurance between the Auto-Owners umbrella policy and the two

Wausau policies, each of which contained an "excess" other insurance clause. *Id.* To resolve the

priority of insurance issue, the Wisconsin Court of Appeals looked to the language of the

insurance policies. *Id.* at 80. The Auto-Owners umbrella policy provided that, "in the event of

exhaustion" of the underlying Auto-Owners primary policy, the Auto-Owners umbrella policy

would "apply in place of [the] scheduled underlying insurance." *Id.* The Court interpreted this

language in the Auto-Owners umbrella policy to mean that "when exhaustion of the auto policy

occurs, the excess clause no longer applies and the umbrella policy *morphs into a primary

policy*." *Id*. at 81 (emphasis added). Because the underlying limits of the Auto-Owners umbrella

policy had been exhausted, the Court held that the Auto-Owners umbrella policy "dropped

down" into the place of that underlying primary policy and no longer retained its umbrella

character. *Id.* at 82.

Finally, as a third alternative, Farmers asks the Court to order a pro rata equitable

apportionment between Farmers and Federal "according to the ratio each respective policy limit

bears to the cumulative limit of all concurrent policies." Response at 18. Farmers argues that the

maximum amount Farmers should contribute to the settlement and defense is one-twelfth of the

total amount because Farmers' policy limit of $1 million is one-twelfth of the total $12 million

available under the three policies combined. *Id.* To support this approach Farmers cites *Canal

Insurance*, 489 F. Supp. 492. In *Canal Insurance*, the United States District Court for the District

of South Carolina concluded that, under Florida law, three insurance policies, including two

primary policies and one true excess policy, must all contribute to a loss covered by all three

policies by prorating on the basis of the total policy limits of all three policies combined. *Id.* at 497. To reach this conclusion, the district court relied on *Hartford Accident & Indemnity Co. v. Liberty Mutual Insurance Co.*, 277 So. 2d 775, 777 (Fla. 1973), in which the Florida Supreme Court held that two *primary* insurance policies must prorate a loss covered by both policies. *See Canal Ins.*, 489 F. Supp. at 497.

The Court has considered each of the three approaches put forth by Farmers and concludes that none of them should control the outcome of Federal's Motion. First, the Court concludes that New Mexico has not adopted Minnesota's approach to determining the priority of insurance coverage between an excess policy and a primary policy. The New Mexico Supreme Court in *Branchal* did consider Minnesota's "closest to the risk" test, but *Branchal*'s holding was narrow: when a passenger in a car is injured, the uninsured motorist coverage for the car involved in the accident is primary over the passenger's own uninsured motorist policy. *See* 106 N.M. at 71, 738 P.2d at 1316. And the New Mexico Court of Appeals applied the "total policy insuring intent" test in *State Farm Fire* because both parties stipulated that Minnesota law should control the outcome of the coverage dispute. 2004-NMCA-101, ¶ 7. Moreover, neither *Branchal* nor *State Farm Fire* resolved a priority of insurance coverage dispute between an excess insurer and a primary insurer. *See* Reply at 4.

Finally, even if the Court *did* apply the total policy insuring test in this case, Farmers probably would not prevail. In *Allstate Insurance Co. v. Frank B. Hall & Co.*, 770 P.2d 1342, 1347-48 (Colo. Ct. App. 1989), the Colorado Court of Appeals resolved a priority of insurance coverage dispute between a primary insurer and an excess insurer. The court held that, under the total policy insuring intent test, the primary insurance policy must be exhausted before the excess insurance policy could be reached. As the court explained, the general rule "that two

16

inconsistent excess clauses cancel each other" does not apply "when one of the clauses is contained within . . . a primary policy . . . and the other is contained within a policy that is designed to be an excess or umbrella policy." *Id.* "In these instances, . . . the 'total policy insuring intent' of the two policies requires that the umbrella coverage continue to be treated as excess, so that it is only after the exhaustion of the other policy's limits that it is held liable for the payment of any additional amounts." *Id.*

The Court also declines to follow the approach taken by the Wisconsin Court of Appeals in *Hansen*. The vertical exhaustion approach taken by the court in *Hansen* was based on the specific language of the insurance policies at issue in that case. Furthermore, Federal has cited several cases which demonstrate that many jurisdictions follow a horizontal exhaustion approach, not a vertical exhaustion approach. *See Iolab Corp. v. Seaboard Sur. Co.*, 15 F.3d 1500, 1504 (9th Cir. 1994) (explaining that in California, "liability under [an excess] policy will not attach until all primary insurance is exhausted, even if the total amount of primary insurance exceeds the amount contemplated in the [excess] policy"(quotation marks and citation omitted)); *Kajima Constr. Servs., Inc. v. St. Paul Fire & Marine Ins. Co.*, 879 N.E.2d 305, 308 (Ill. 2007) ("[A]ll primary policies must be exhausted prior to reaching an excess policy."); *Home Ins. Co. v. Liberty Mut. Ins. Co.*, 678 F. Supp. 1066, 1069 (S.D.N.Y. 1988) ("New York courts have consistently found that an umbrella policy is not required to contribute to the payment of a settlement until all other applicable policies have been exhausted regardless of the wording of those policies 'other insurance' clauses.").

Moreover, the Court has found many additional cases supporting Federal's position and concludes that a clear majority of courts, which have considered the issue presented in Federal's Motion, have held that all primary insurance must be exhausted before an excess insurance

policy is reached. *See, e.g.*, *Horace Mann Ins. Co. v. Gen. Star Nat. Ins. Co.*, 514 F.3d 327, 334 (4th Cir. 2008) ("Although the West Virginia Supreme Court has not spoken on this precise question, the general rule is that as between a true excess policy and a primary liability policy with an other-insurance clause, the limits of the policy that provides primary insurance must *always* be exhausted before coverage under the excess policy is triggered[.]"); *Nat'l Sur. Corp. v. Ranger Ins. Co.,* 260 F.3d 881, 884 (8th Cir. 2001) ("[A]n insurer that issued a 'true excess' or 'umbrella' policy is not liable for any portion of the loss until the primary insurer's policy limit has been exhausted, even if the primary policy contains an other-insurance clause." (citations omitted)); *Occidental Fire & Cas. Co. of N.C. v. Brocious*, 772 F.2d 47, 54 (3d Cir. 1985) (predicting that Pennsylvania would follow the majority rule that "primary policies or policies with excess clauses must be exhausted before the carrier of an umbrella policy is required to pay"); *Philadelphia Indem. Ins. Co. v. Employers Ins. Co. of Wausau*, 703 F. Supp. 2d 41, 49-50 (D. Me. 2010) (holding that a "true excess policy" could not be reached until all primary policies, including those with excess insurance clauses, had been exhausted); *Indep. Fire Ins. Co. v. Mut. Assurance, Inc.*, 553 So. 2d 115, 118 (Ala. 1989) ("The 'other insurance' clauses of a primary policy with an excess clause and an umbrella policy are not equivalent and are not mutually repugnant so that they cancel one another." (quotation marks and citation omitted)); *Bosco v. Bauermeister*, 571 N.W.2d 509, 510 (Mich. 1997) ("We conclude that a distinct difference exists between 'true' excess insurance coverage and excess 'other insurance' on the basis of the difference in policy types within the insurance industry, the premiums charged for and risks assumed by the policies, the language of the policies, and the reasonable expectations of all the contracting parties. This difference requires an excess 'other insurance' policy to be exhausted before 'true' excess insurance policies are required to contribute to a loss."); *Liberty*

*Mut. Ins. Co. v. U.S. Fire Ins. Co.*, 590 S.W.2d 783, 785 (Tex. Civ. App. 1979) (concluding that a primary policy with an "excess" other insurance clause must be exhausted before reaching a "true" excess policy).

The majority rule for which Federal advocates is also supported by several insurance law treatises. *See Appleman*, *supra*, § 22.02[2], at 22-12 (explaining that special rules governing other insurance clauses should be applied only "to multiple policies on the same level, and not as to the relationship between, for example, a primary and excess policy"); Barry R. Ostrager & Thomas R. Newman, 2 *Handbook on Insurance Coverage Disputes* § 11.03[e][1], at 991-92 (15th ed. 2011 Supp.) (citing cases demonstrating that "other insurance" clauses only cancel each other out when the insurance policies at issue are within the same level of coverage, i.e., two primary policies); Lee R. Russ & Thomas F. Segalla, 15 *Couch on Insurance*, § 220.41, at 220-51 (3d ed. 2005) ("As a general rule, where two policies have competing excess 'other insurance' clauses, the clauses cancel each other out and the policies pro rate. Likewise, two true excess policies at the same level of insurance pro rate the loss. As a rule, however, excess and umbrella policies are regarded as over and above any type of primary coverage, excess provisions arising in regular policies in any manner, or any escape clauses.").

The Court also declines to adopt the pro rata apportionment approach taken in *Canal Insurance*. In light of the majority rule discussed above, the Court concludes that it would be improper to prorate a loss between a primary insurer and an excess insurer merely because each policy contains an excess "other insurance" clause. New Mexico, like many other jurisdictions, requires pro rata apportionment in cases where two concurrent insurance policies "insure the same property, the same interest, and against the same risk." *United Servs. Auto. Ass'n v. Agric. Ins. Co.*, 67 N.M. 333, 335, 355 P.2d 143, 144 (1960) (explaining that if concurrent insurance

19

"policies insure the same property, the same interest, and against the same risk," then "payment for loss is to be prorated on the basis of the total insurance"). Further, New Mexico requires insurers to prorate damages and defense costs in situations where two primary policies contain "excess" other insurance clauses that are mutually repugnant and cancel each other out. *See Am. Employers' Ins. Co. v. Cont'l Cas. Co.*, 85 N.M. 346, 351, 512 P.2d 674, 679 (1973); *see also S.C. Ins. Co. v. Fid. & Guar. Ins. Underwriters*, 489 S.E.2d 200, 204 (S.C. 1997) ("If two policies both contain 'excess' clauses, but otherwise appear to provide for primary coverage, the excess clauses should be disregarded, and the concurrently covered loss prorated according to the policy limits of the respective policies.").

However, a primary insurance policy insures against a different, greater risk than a true excess insurance policy does, as reflected by the difference in premium costs between the two types of insurance. *See Ins. Co. of N. Am. v. Am. Economy Ins. Co.*, 746 F. Supp. 59, 62-64 (W.D. Okla. 1990) (predicting that Arkansas would follow the majority rule and noting that "the trend in the law is to read true excess policies for what they are, regardless of their name and regardless of excess clauses found in primary policies that attempt to limit risk by proration with true excess policies"); *Cincinnati Ins. Co. v. Am. Hardware Mfrs. Ass'n*, 898 N.E.2d 216, 242 (Ill. App. Ct. 2008) ("Equitable contribution does not apply to primary/excess insurance issues because [primary and excess policies] cover different risk by their very definitions."); *see also Appleman, supra,* § 24.07[3][b], at 24-95 (Excess and umbrella policies clearly differ in purpose from primary policies containing excess 'other insurance' clauses, such that the proration of a loss between an excess insurer and a primary insurer seeking excess status by virtue of its "other insurance" clause is improper.").

The Court concludes that the Federal Excess policy is a "true" excess policy, as

demonstrated by its relatively low premium, relatively high liability limits, and schedule of underlying insurance. The Court predicts that New Mexico would follow the majority rule, that a true excess insurance policy is not invoked until all primary insurance has been exhausted. Accordingly, Federal's Motion for partial summary judgment should be granted.

**IT IS ORDERED THAT** (1) Federal's Motion for Partial Summary Judgment to Establish Priority of Insurance (Doc. No. 46) is granted, and (2) Federal's request that the Court defer ruling on Federal's Motion under Fed. R. Civ. P. 56(d) is denied.

_____

SENIOR UNITED STATES DISTRICT COURT JUDGE

21